IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| WESTERN ELECTRICITY COORDINATING COUNCIL, a Utah nonprofit corporation,<br><br>Plaintiff,<br><br>v.<br><br>CLEANCOUNTS f/k/a MIDWEST RENEWABLE ENERGY TRACKING SYSTEM, INC., a Wisconsin nonprofit corporation,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS<br><br>Case 2:25-cv-01018-TS-JCB<br><br>District Judge Ted Stewart<br>Magistrate Judge Jared C. Bennett |

This matter is before the Court on Defendant CleanCount's Motion to Dismiss for lack of personal jurisdiction and failure to state a claim.[1] For the reasons stated below, the Court will deny the Motion.

## I. BACKGROUND[2]

Plaintiff Western Electricity Coordinating Council is a Utah-based 501(c)(3) nonprofit corporation that is responsible for "assuring a reliable and secure flow of electricity to the geographic region known as the Western Interconnection," which includes areas of Canada, Mexico, and the United States, including Utah.[3] Related to its responsibilities, Plaintiff operates several programs, including the Western Renewable Energy Generation Information System ("WREGIS"), which "provides renewable energy generators in the West with access to an online

[1] Docket No. 6.

[2] The facts described in this section are taken from the Complaint.

[3] Docket No. 1-2 ¶ 7.

tracking system and database used for tracking and verifying renewable energy credits and other energy attributes."[4] WREGIS's operation depends on third-party tracking software.

Defendant CleanCounts, formerly known as Midwest Renewable Energy Tracking System, Inc., or M-RETS, is a Wisconsin nonprofit with its principal place of business in Minnesota. Defendant operates a renewable energy tracking system in the Midwest, which uses a software platform that Defendant developed for this purpose.

On March 11, 2022, Plaintiff and Defendant entered into a Collaboration, Development and Services Agreement (the "Agreement"), under which Defendant would provide Plaintiff with the necessary tracking software. Specifically, Defendant agreed to customize its existing software platform for Plaintiff's WREGIS program in exchange for a one-time development and licensing fee of $2,000,000.00 and an annual licensing fee of $800,000.00 for each year of the Agreement. The Agreement also contemplates that the parties would "work collaboratively on future developments and projects."[5] Further, for the purpose of protecting Plaintiff and "its significant investment in WREGIS," the Agreement includes a non-solicitation, confidential information, and publicity clause.[6]

The Agreement was executed in Minnesota and provides that it "shall be governed by and interpreted in accordance with the laws" of Minnesota.[7] The initial term ran from March 11, 2022, to December 31, 2025, with Plaintiff having the option to renew for an additional two years at the conclusion of the initial term. Plaintiff elected to renew, moving the term's end date to December 31, 2027.

[4] *Id.* ¶ 10.

[5] *Id.* ¶ 16.

[6] *Id.* ¶ 22.

[7] *Id.* ¶ 15.

In September 2024, Defendant informed Plaintiff that it would not extend the term beyond the end of December 2027. Thereafter, the parties informally agreed that Plaintiff would procure a new software developer for WREGIS and Defendant would "provide reasonable support through the transition."[8]

In April 2025, Plaintiff contacted Defendant with proposed messaging regarding the termination of the Agreement, which would be conveyed to WREGIS users and stakeholders. Following some back and forth, the parties agreed on the messaging. However, the day before Plaintiff intended to release the agreed upon messaging, Defendant released its own statement announcing the Agreement's termination, which Plaintiff did not approve and which portrayed Plaintiff in a negative light. Plaintiff asserts this was "the beginning of [Defendant's] efforts to undermine" Plaintiff, WREGIS, and their relationship with their subscribers.[9]

On August 24, 2025, Defendant sent an email to WREGIS users and personnel inviting them to attend a virtual presentation about Defendant's proposed "continuity-first path" for the western renewable energy market "in the absence of WREGIS."[10] Plaintiff believes this email campaign was directed to its customers.

In response to learning about the planned virtual presentation, Plaintiff issued a cease and desist letter demanding that Defendant "cease all unlawful acts" including the scheduled presentation.[11] Defendant continued with the presentation regardless and, the next day, issued a press release stating that "[i]n response to [Plaintiff's] decision to divest from WREGIS and pursue building duplicative software, [Defendant's] continuity-first approach keeps stakeholder

---

[8] *Id.* ¶¶ 34, 39.

[9] *Id.* ¶ 47.

[10] *Id.* ¶ 50.

[11] *Id.* ¶ 53.

data secure where it is today, freezes fees through 2029, and enables the return of reserve funds to customers."[12] The press release further detailed purported benefits Defendant could offer prospective customers and provided a link to (1) a written "Proposal to Provide Customer-Centric Registry Platform Services to Western Interconnection Stakeholders,"[13] and (2) a link to a recording of the previously held presentation.

The proposal represented that "[b]y selecting [Defendant], Western Interconnection stakeholders can avoid a risky, costly, and time-consuming build, while ensuring responsive and high-quality service," and further detailed the risks of maintaining business with Plaintiff during the transition, while outlining the benefits Defendant can offer.[14] The presentation's messaging similarly explained Plaintiff's plans regarding WREGIS, identified a number of risks associated with its plan, and generally pitched Defendant's continuity-first proposal as the better option.

Plaintiff asserts that, as of the filing of the Complaint, Defendant "is still refusing to cease its unlawful conduct," "continues to breach the Agreement," refuses to provide Plaintiff's counsel with a copy of the mailing list it used to invite WREGIS customers to the virtual presentation, and "is engaging in additional, targeted outreach to WREGIS customers . . . to take business from WREGIS."[15] Plaintiff represents that such conduct has caused it to suffer loss of proprietary and confidential information, loss of goodwill with current and prospective customers, and reputational damage.

In response to Defendant's above-summarized actions, Plaintiff filed the instant suit in Utah Business and Chancery Court. Plaintiff asserts the following causes of action against

---

[12] *Id.* ¶ 54.

[13] *Id.* ¶ 57.

[14] *Id.* ¶ 59.

[15] *Id.* ¶¶ 65–67.

Defendant: (1) declaratory relief pursuant to Utah Code Ann. § 78B-6-401; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; and (4) tortious interference with economic relations. Defendant subsequently removed the case to this district court, and now seeks dismissal of all claims, arguing that this Court lacks personal jurisdiction over Defendant[16] and, alternatively, that the Complaint fails to state a claim upon which relief can be granted.[17]

## II. DISCUSSION

### *a. Personal Jurisdiction*

Federal Rule of Civil Procedure 12(b)(2) is the vehicle by which a party may move for dismissal based on lack of personal jurisdiction. Plaintiff bears the burden of establishing jurisdiction over Defendant.[18] When a motion to dismiss for lack of personal jurisdiction is brought before trial and supported by affidavits and other written materials, the plaintiff need only make a prima facie showing of jurisdiction.[19] "The 'well pled facts' of the complaint must be accepted as true if uncontroverted by the defendant's affidavits, and factual disputes at this initial stage must be resolved in the plaintiff's favor when the parties present conflicting affidavits."[20]

Defendant's removal invokes diversity jurisdiction. "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state *and* that the exercise of jurisdiction does not offend the due

---

[16] Fed. R. Civ. P. 12(b)(2).

[17] *Id*. 12(b)(6).

[18] *Kuenzle v. HTM Sport-Und Freizeitgeräte AG*, 102 F.3d 453, 456 (10th Cir. 1996).

[19] *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

[20] *FDIC v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992).

process clause of the Fourteenth Amendment."[21] Utah's long arm statute supports personal jurisdiction "over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution."[22] The Utah Supreme Court "frequently make[s] a due process analysis first because any set of circumstances that satisfies due process will also satisfy the long-arm statute."[23] Accordingly, the Court proceeds "to determine whether the exercise of personal jurisdiction over [Defendant] meets federal due process standards."[24]

"[T]o exercise jurisdiction in harmony with due process, defendants must have 'minimum contacts' with the forum state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'"[25] Such "minimum contacts" may give rise to either general or specific personal jurisdiction.[26] "General jurisdiction, as its name implies, extends to any and all claims brought against a defendant."[27] "A state court may exercise general jurisdiction only when a defendant is essentially at home in the State."[28]

Specific jurisdiction, by contrast, applies when "in exchange for 'benefitting' from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of

---

[21] *Far West Cap., Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995).

[22] Utah Code Ann. § 78B-3-201(3); *see also Starways, Inc. v. Curry,* 1999 UT 50, ¶ 7, 980 P.2d 204. ("We have held that the Utah long-arm statute 'must be extended to the fullest extent allowed by due process of law.'") (quoting *Synergetics v. Marathon Ranching Co.*, 701 P.2d 1106, 1110 (Utah 1985)).

[23] *SII MegaDiamond, Inc. v. Am. Superabrasives Corp.,* 969 P.2d 430, 433 (Utah 1998).

[24] *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1298 (10th Cir. 1999).

[25] *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[26] *Monge v. RG Petro-Mach. (Grp.) Co.*, 701 F.3d 598, 613 (10th Cir. 2012).

[27] *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (internal quotation marks and citations omitted).

[28] *Id.*

jurisdiction for claims related to those contacts."[29] "The minimum contacts necessary for specific personal jurisdiction are established if the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to" those activities."[30] "If the defendant's activities create sufficient minimum contacts, [courts] then consider 'whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice.'"[31]

1. Minimum Contacts

"The minimum contacts test for specific jurisdiction encompasses two distinct requirements: that the defendant must have 'purposefully directed its activities at residents of the forum state,' and that 'the plaintiff's injuries must arise out of the defendant's forum-related activities.'"[32]

Purposeful direction will be found "where the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum."[33] "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State."[34]

---

[29] *Dudnikov*, 514 F.3d at 1078.

[30] *Soma Med.*, 196 F.3d at 1298 (internal quotation marks and citation omitted).

[31] *Id.* (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998)).

[32] *Old Republic Ins. Co. v. Cont'l. Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017) (quoting *Shrader*, 633 F.3d at 1239).

[33] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985) (internal quotation marks and citations omitted).

[34] *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (quoting *Burger King Corp.*, 471 U.S., at 475).

The Tenth Circuit has enumerated three instances where an out-of-state defendant's activities may arise to purposeful direction: "(1) continuing relationships with forum state residents ('continuing relationships'); (2) deliberate exploitation of the forum state market ('market exploitation'); and (3) harmful effects in the forum state ('harmful effects')."[35]

Where, as here, the claims involve allegations of both breach of contract and business torts committed by an out-of-state defendant, the harmful effects analysis first dictated in *Calder v. Jones*,[36] provides the proper framework for the purposeful direction analysis.[37] Applying the *Calder* effects test, the Court must determine "whether an out-of-state defendant's tortious conduct satisfies three elements: '(1) an intentional action; (2) expressly aimed at the forum state; and (3) knowledge that the brunt of the injury would be felt in the forum state.'"[38] Importantly, under this framework, "the plaintiff cannot be the only link between the defendant and the forum."[39]

Plaintiff asserts the following conduct in support of jurisdiction: Defendant entered into a multi-year Agreement to license a software program for and collaborate with Utah-based Plaintiff, among other things. Defendant's work with Plaintiff in pursuit of the Agreement's objectives resulted in "weekly, and in many cases daily" contact between Defendant and Plaintiff.[40] Once the expiration date of the Agreement was established, Defendant "aimed a

---

[35] *Old Republic Ins. Co.*, 877 F.3d at 905.

[36] 465 U.S. 783 (1984).

[37] *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 966 n.9 (10th Cir. 2022) ("[O]ur precedent suggests that the effects test is the correct test to use in the context of business torts committed by an out-of-state defendant" even where the "case involves a contract dispute.").

[38] *Id.* at 967 (quoting *Dental Dynamics, LLC, v. Jolly Dental Grp.*, LLC, 946 F.3d 1223, 1231 (10th Cir. 2020)).

[39] *Walden*, 571 U.S. at 285.

[40] Docket No. 7, at 16 (citing Docket No. 7-1 ¶ 5, Declaration of Andrea Coon).

marketing campaign at WREGIS's market"[41] by: issuing a public statement casting Plaintiff in a bad light; sending email invitations to WREGIS users, some of whom are residents of Utah, to attend a virtual presentation wherein Defendant undermined Plaintiff and solicited Plaintiff's customers; and published a press release describing Defendant's plan for WREGIS users as less risky and generally superior to that of Plaintiff's. Plaintiff further notes that Defendant's "continuity-first" plan proposes that Defendant's will use "Utah-based WREGIS's data, which it has access to by virtue of its contractual relationship" with Plaintiff, without Plaintiff's permission.[42] Plaintiff argues:

> These announcements and solicitations were designed to reach and influence the very customers, regulators, and stakeholders [Plaintiff] serves from Utah, with knowledge that the harm to [Plaintiff's] goodwill and customer relationship would be felt at [Plaintiff's] Utah headquarters and among Utah customers.

Considering the above assertions, the first requirement of the *Calder* effects test is easily met here.[43] Plaintiff alleges numerous intentional actions taken by Defendant. Defendant does not appear to suggest otherwise. However, the second requirement—whether Defendant's conduct was expressly aimed at Utah—requires further analysis. In determining whether a defendant expressly aimed its actions at the forum state, the "plaintiff's contacts with the defendant and forum" cannot "drive the jurisdictional analysis," and "mere injury to a forum resident is not a sufficient connection to the forum."[44] Instead, the forum state must be the "focal point" of *the defendant's* tortious conduct.[45] Therefore, "[t]he proper question is not whether

---

[41] *Id.*

[42] *Id.*

[43] *See Newsome v. Gallacher,* 722 F.3d 1257, 1268 (10th Cir. 2013) ("The intentional action element requires little discussion. The record contains no suggestion that the . . . defendants acted unintentionally when they took the steps that allegedly led to [the plaintiff's] failure.").

[44] *Walden*, 571 U.S. at 289–90.

[45] *Newsome*, 722 F.3d at 1269.

plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."[46] Several Tenth Circuit opinions illuminate this distinction.

In *Dudnikov*,[47] the complaint alleged that the out-of-state defendants terminated the Colorado-based plaintiffs' online eBay auction by sending an allegedly erroneous notice of claimed infringement to eBay. eBay was located in California. The defendants argued they had not expressly aimed their conduct at Colorado because the action complained of—the email causing eBay to terminate the auction—was directed at California. The Tenth Circuit rejected the defendants' argument finding that it overlooked the allegations that the defendants had emailed California with the intent to stop the auction they knew was being held in Colorado.

> In this way, it is something like a bank shot in basketball. A player who shoots the ball off of the backboard intends to hit the backboard, but he does so in the service of his further intention of putting the ball into the basket. Here, defendants intended to send the [notice of claimed infringement] to eBay in California, but they did so with the ultimate purpose of cancelling plaintiffs' auction in Colorado.[48]

Accordingly, the court concluded that the defendants had expressly aimed their conduct at Colorado, subjecting them to the jurisdiction of the Colorado district court.

By contrast, in *Eighteen Seventy*,[49] the Tenth Circuit affirmed a Wyoming district court's dismissal for lack of personal jurisdiction where the Wyoming-based plaintiffs alleged they lost $10 million they had invested in a company as a result of the out-of-state defendant's misrepresentations and material omissions. The plaintiffs asserted the defendant made "continuous security offerings in the United States and in the State of Wyoming[,] which were

---

[46] *Walden*, 571 U.S. at 290.

[47] 514 F.3d 1063.

[48] *Id.* at 1075.

[49] 32 F.4th 956.

sold to investors in Wyoming *and elsewhere in the United States*."[50] The plaintiffs also alleged that they were the business's "primary funder and repeat lender."[51] The Tenth Circuit found that these allegations failed to establish that Wyoming was "the focal point" of the defendant's tortious conduct where the plaintiffs had not shown there was anything "unique" about the plaintiffs or Wyoming "that led [the defendant] to prepare fraudulent materials or withhold information about [the business]."[52] In so finding, the court distinguished the case from *Dudnikov*, finding that in that case, "it was not only important that the plaintiff felt the effects of the defendants' actions in the forum state but that the defendants' actions targeted the forum state."[53]

This distinction is further underscored in *Newsome*.[54] In that case, the plaintiff alleged the defendants had breached their fiduciary duty to the plaintiff, a business, causing it to fail. The defendants were made up of individual corporate officers and directors of the plaintiff's parent company, and a law firm hired by the parent company. The Tenth Circuit ruled that, because "the individual defendants d[id] not contest that they knew [the plaintiff] operated exclusively in Oklahoma, making Oklahoma the focal point of any tort against [the plaintiff], . . . [the individual defendants] expressly aimed their actions at Oklahoma when they acted toward [the plaintiff]."[55] However, as to the law firm, the Tenth Circuit found no evidence of express aiming where the firm's association with the plaintiff was based solely on the Canadian-based parent

---

[50] *Id.* at 975.

[51] *Id.*

[52] *Id.*

[53] *Id.* (quoting *Anzures v. Flagship Rest. Grp.*, 819 F.3d 1277, 1281 (10th Cir. 2016)).

[54] 722 F.3d 1257.

[55] *Id.* at 1269.

company hiring the firm and there was no evidence that "the attorney reached out to the client's home forum to solicit the client's business," or otherwise directed its conduct at Oklahoma.[56]

The allegations in this case are most similar to those in *Dudnikov* and against the individual defendants in *Newsome*. Defendant entered into an Agreement to customize software for and provide ongoing services for Utah-based Plaintiff in exchange for monetary payment. Plaintiff is headquartered in and operates from Utah. WREGIS, the program for which Defendant provides services directly, is also based in Utah. The Agreement between the parties states that Plaintiff is a Utah nonprofit corporation with its principal place of business located in Salt Lake City, Utah. As part of Defendant's contracted-for services, it has maintained regular contact with Plaintiff's Salt Lake City headquarters. There is no debate regarding Defendant's knowledge that Plaintiff is based in and operates from Utah.

Plaintiff alleges that Defendant has taken specified actions, in breach of the Agreement and in violation of the law, to undermine, take customers from, and otherwise harm Plaintiff's Utah-based business.

> From this, [the Court can] reasonably infer that, when the defendants allegedly intended to engage in wrongful conduct that would be harmful to [Plaintiff's] business operations . . . they necessarily intended for the focal point of their wrongful conduct to be [Utah]. In other words, as in *Dudnikov*, . . . [Defendant] had notice that the harmed business's activities implicating the defendants were centered in the forum state.[57]

Likewise, as in *Dudnikov*, it does not matter where the allegedly offending messaging was sent, published, or from where it originated. Because the Complaint alleges that the action was ultimately taken with the intention of affecting Plaintiff's Utah-based business, the Court finds

[56] *Id.* at 1281.

[57] *Eighteen Seventy*, 32 F.4th at 974.

Plaintiff has made a prima facie showing that Defendant's conduct was expressly aimed at Utah, and the second requirement of the *Calder* effects test has been met.

Regarding the third *Calder* requirement—whether Defendant had knowledge that the brunt of the injury would be felt in the forum state—Defendant argues that mere foreseeability of injury is insufficient to meet this prong and, therefore, Plaintiff has failed to make the requisite showing. The *Dudnikov* court expressly rejected this very argument, stating:

> We surely agree that under *Calder* the mere foreseeability of causing an injury in the forum state is, standing alone, insufficient to warrant a state exercising its sovereignty over an out-of-state defendant. But under the *Calder* test plaintiffs . . . have established for purposes of a motion to dismiss . . . not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook *intentional actions that were expressly aimed at that forum state.* That is, in satisfying *Calder*'s first two prongs, plaintiffs have established that defendants acted with more than foresight (or knowledge) that effects would be felt in Colorado.[58]

Because Plaintiff has alleged sufficient facts to support each requirement of the harmful effects analysis, the Court finds that Defendant purposefully directed its activities at residents of the forum state.

The Court must next determine whether Plaintiff's injuries "arise out of" Defendant's forum-related activities to establish the requisite minimum contacts. As stated, Plaintiff alleges it has suffered loss of proprietary and confidential information, loss of goodwill with its current and prospective customers, and reputational damage. These purported harms are a direct result of Defendant's wrongful conduct, as alleged in the Complaint, which the Court found was "expressly aimed" at Utah. The alleged wrongful conduct is both the basis for the underlying claims and the basis on which the Court found Defendant expressly aimed its conduct at Utah. Therefore, the Court finds that Plaintiff's alleged injuries arise out of Defendant's forum-related

[58] *Dudnikov*, 514 F.3d at 1077.

activities. Accordingly, Plaintiff has made a prima facie showing that Defendant has the requisite minimum contacts with Utah, sufficient to establish jurisdiction.

2. Due Process Under the Fourteenth Amendment

Having decided Defendant has sufficient minimum contacts with Utah, the Court must next consider whether exercising jurisdiction offends "traditional notions of fair play and substantial justice" under the Fourteenth Amendment.[59] In determining whether exercise of jurisdiction is so unreasonable as to violate "fair play and substantial justice," the Court considers:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.[60]

When a court determines the reasonableness of asserting jurisdiction, the court also considers its minimum contacts determination. "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."[61]

In considering all the factors, the Court finds that exercising jurisdiction would not offend notions of fair play and substantial justice. Defendant first asserts the burden it would experience if required to litigate the matter in Utah would be significant because it "has no offices, employees, property, registrations, or banking relationships" in Utah "and all engineering, development, hosting, and operational activities occur outside Utah."[62] While admittedly not as

---

[59] *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 105 (1987) (quoting *Int'l Shoe Co.*, 326 U.S. at 316).

[60] *OMI Holdings, Inc.*, 149 F.3d at 1095.

[61] *Asahi Metal Indus. Co.*, 480 U.S. at 114.

[62] Docket No. 6, at 18.

convenient for Defendant as litigating the matter in Minnesota, which Defendant submits is the better forum, Defendant has not suggested that its defense "would be hindered by the territorial limits of [this Court's] power to subpoena relevant witnesses, or indeed hampered in any other significant way."[63] The challenges Defendant asserts are those that most any out-of-state party would face, including Plaintiff if it were required to bring an action in Minnesota.

Like Plaintiff, Defendant has an interest in receiving convenient and effective relief. However, "as in any case in which the parties reside in different fora, one side must bear the inconvenience of litigating 'on the road.'"[64] Because neither party has asserted that litigating in their respective undesired district court will significantly hinder their ability to present their complete case or defense, the first and third factors do not weigh decidedly in either direction.

Regarding Utah's interest in resolving the dispute, Defendant asserts "Utah should have little legitimate interest in adjudicating this dispute."[65] This is incorrect as it is well established that "[s]tates have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors."[66] Here, the Court has found that the Complaint sufficiently supports that Defendant purposefully directed the alleged conduct at a Utah-based business, which serves a number of Utah-based clients, and supports an important function in Utah. Utah therefore has a significant interest in resolving the dispute.

Relatedly, the Court must next assess "whether the forum state is the most efficient place to litigate the dispute."[67] "Key to this inquiry are the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether

---

[63] *Dudnikov*, 514 F.3d at 1081.

[64] *Id.*

[65] Docket No. 10, at 12.

[66] *OMI Holdings, Inc.*, 149 F.3d at 1096.

[67] *Id.* at 1097.

jurisdiction is necessary to prevent piecemeal litigation."[68] Defendant argues Minnesota is the most efficient forum to litigate the dispute because the Agreement requires interpretation of Minnesota law. Plaintiff argues efficiency considerations favor Utah, "where the effects of the challenged conduct are concentrated and where witnesses from [Plaintiff] and impacted stakeholders are accessible."[69] The Court finds this factor does not weight decidedly in favor of Minnesota. While Minnesota is the preferred forum for interpreting Minnesota law, as will be required in interpreting the contract, the Court has experience in applying the laws of other jurisdictions and sees no significant hurdles in doing so here. Further, as will be discussed later, application of Utah law will also be necessary to resolve the claims. The other considerations raised by Defendant, including where the wrong occurred and where witnesses are located, do not suggest Minnesota is the only fair forum where the action could be brought.

Neither party raised any arguments in relation to the fifth factor. Based on the Court's consideration of the above factors, the Court finds that, while some considerations may support Minnesota as the preferable forum, "they are not so compelling as to overcome [Plaintiff's] demonstration of minimum contacts."[70]

In light of the Court's findings that Defendant has sufficient minimum contacts to establish specific jurisdiction with Utah and that exercising jurisdiction would not be unreasonable under the Fourteenth Amendment's due process requirements, the Court finds that

---

[68] *Id.* (citations omitted).

[69] Docket No. 7, at 22.

[70] *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1292 (10th Cir. 2020); *see also Newsome*, 722 F.3d at 1274 ("A handful of considerations favor defendants. But they have not carried their overall burden of convincing us that Oklahoma jurisdiction would offend fair play and substantial justice.").

Plaintiff has made a prima facie showing that the Court has jurisdiction over Defendant. Accordingly, the Court will not dismiss the Complaint for lack of jurisdiction.

*b. Failure to State a Claim*

Defendant next argues that the Complaint fails to state a claim upon which relief can be granted. When evaluating a complaint under Federal Rule of Civil Procedure 12(b)(6), the Court accepts all well-pleaded factual allegations, as distinguished from conclusory allegations, as true and views them in the light most favorable to the non-moving party.[71] The plaintiff must provide "enough facts to state a claim to relief that is plausible on its face,"[72] which requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[73] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[74]

As stated, Plaintiff brings four claims against Defendant: (1) declaratory relief; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; and (4) tortious interference with economic relations.

Before the Court can examine Plaintiff's claims for sufficiency, it must determine which jurisdiction's laws govern each of the claims. "In making choice of law determinations, a federal court sitting in diversity must apply the choice of law provisions of the forum state in which it is

---

[71] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[72] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[73] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[74] *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (alteration in original).

sitting."[75] "This is true even when choice of law determinations involve the interpretation of contract provisions."[76]

"When determining which state's laws will apply to a dispute, Utah courts first look to whether there was an 'effective choice of law' by the parties."[77] Here, the Agreement provides that it "shall be governed by and interpreted in accordance with the laws of the State of Minnesota."[78] The parties do not dispute the validity of this clause. Nor do they dispute that the clause dictates that Minnesota law is applicable to the breach of contract claim.

The parties disagree, however, regarding the scope of the Minnesota choice-of-law clause. Plaintiff argues that the narrow scope of the language does not encompass its tort claim. Defendant maintains that the choice of law clause is broadly applicable to "any disputes arising out of the Agreement."[79]

Notably, however, the clause does not actually include the language "arising out of," or any other broad language suggesting that the parties intended the Minnesota law to govern any and all disputes between the contracting parties. Courts have found that language such as "shall govern all claims relating to the Agreement" or "shall govern all disputes arising between the parties" is necessary to demonstrate that the parties intended all conduct arising from the relationship to be governed by a choice-of-law provision.[80] The plain language of the

---

[75] *Shearson Lehman Bros. v. M & L Invs.*, 10 F.3d 1510, 1514 (10th Cir. 1993).

[76] *Id.*

[77] *Volonte v. Domo, Inc.*, 2023 UT App 25, ¶ 74, 528 P.3d 327.

[78] Docket No. 1-2 ¶ 15.

[79] Docket No. 6, at 19.

[80] *See Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 492 (D. Utah 2017) (applying Utah choice of law analysis and finding the plain language of the agreement, which stated, "[t]his Agreement shall be interpreted under the laws of the United States and the State of Utah," suggested that "the choice of law provisions apply only to issues of contractual interpretation").

Agreement's choice-of-law clause is, as Plaintiff suggests, narrowly drafted and applies Minnesota law only to the "govern[ance] and interpret[ation] of" the Agreement. The Court therefore finds the parties did not agree to apply Minesota law to tort claims.

If there is not an "effective choice of law" by the parties, "[Utah] courts apply the 'most significant relationship' approach as described in the Restatement (Second) of Conflict of Laws in determining which state's laws should apply to a given circumstance."[81] Where the relevant "claims sound in tort,"[82] § 145 of the Restatement applies and directs the court to consider the following:

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.[83]

Considering the above factors, and the related guidance in the Restatement, the Court finds that Utah has the most significant relationship to the Plaintiff's tort claim. Most importantly, as Plaintiff's headquarters, Utah is the place where the alleged injuries occurred or are occurring. As the Comments to the Restatement explain, "the place of the plaintiff's . . . principal place of business, is the single most important contact for determining the state of the applicable law as to most issues in situations involving the multistate publication of matter that injures plaintiff's reputation . . . or causes him financial injury."[84] Such are the allegations involved here. Further, the Court finds that Utah is the place where the relationship between the parties is centered. While Defendant conducts business outside of Utah, the purpose of the

---

[81] *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 14, 54 P.3d 1054.

[82] *Id.* ¶ 18.

[83] Restatement (Second) Conflict of Laws § 145(2) (1971).

[84] *Id.* § 145 cmt. e.

Agreement between the parties is to provide certain services related to WREGIS, which is based in Utah.

Defendant argues that the § 145 factors do not favor Utah because "the relevant conduct occurred outside Utah, the contractual relationship is governed by Minnesota law, and [Defendant] is not a Utah entity."[85] The Court is not convinced. Defendant has not provided any argument as to why its location should weigh more heavily than Plaintiff's location. The allegations do not support that the conduct giving rise to the claims occurred exclusively in Minnesota. And the parties chose not to designate Minnesota as the proper forum or Minnesota law as the applicable law to all claims arising out of the relationship. Therefore, the Court finds these factors do not outweigh those supporting Utah's interest, as the state where the injury occurred and which is home to the program on which the parties' contractual relationship is based.

Now, moving on to the sufficiency of Plaintiff's claims. Defendant alleges Plaintiff has failed to plead a breach of contract or breach of the implied covenant of good faith and fair dealing. The elements of a breach of contract claim under Minnesota law are "(1) formation of a contract, (2) performance by [the] plaintiff of any conditions precedent to [its] right to demand performance by the defendant, and (3) breach of the contract by [the] defendant."[86] Further, "[u]nder Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract."[87]

---

[85] Docket No. 10, at 13.

[86] *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (internal quotation marks and citation omitted).

[87] *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (internal quotation marks and citation omitted).

Defendant has not challenged the Complaint's assertions as to the above elements, and the Court finds that Plaintiff's allegations are sufficient to support each of them. Instead, Defendant argues the claim fails because the Complaint does not allege any "actual harm" or "articulable damage."[88]

The Complaint alleges that Plaintiff has suffered loss of proprietary and confidential information, loss of goodwill with current and prospective customers, and reputational damage in excess of $300,000.00 as a result of Defendant's alleged wrongful actions. It further states that Plaintiff is entitled to damages that flow from lost revenues, lost business opportunities, lost customers, increased costs of operations, etc. These allegations are more than sufficient to survive a motion to dismiss under either court's pleading requirements. Notably, the Minnesota Supreme Court has directed as follows:

> Even though a claimant's damages may be difficult to prove, it is improper to deny the claimant a chance to prove those damages by dismissing the claim based on the allegations of the complaint. When damages for a claim are purely speculative or unmanageably complex, they will be barred at the summary judgment stage.[89]

Defendant also argues that Plaintiff fails to state a claim for "tortious interference with a contract" under Minnesota law. However, as noted, Minnesota law applies only to Plaintiff's contract-related claims. The elements of "tortious interference with a contract" under Minnesota law, and discussed by Defendant, are different than those for "tortious interference with economic relations" under Utah law. To plead a claim for tortious interference with economic relations under Utah law, a complaint must plead "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing

---

[88] Docket No. 6, at 23.

[89] *Halva v. Minn. State Colls. & Univs.*, 953 N.W.2d 496, 502 (Minn. 2021) (internal quotation marks and citation omitted).

injury to the plaintiff."[90] "[T]he tort of intentional interference with economic relations 'protects both existing contractual relationships and prospective relationships of economic advantage not yet reduced to a formal contract."[91]

Although less significant on application of Utah law, Defendant argues that Plaintiff has not shown Defendant's actions caused any of Plaintiff's customers to alter their contractual relationship with Plaintiff. Additionally, Defendant argues that Plaintiff has not shown any harm as a result of Defendant's purported tortious conduct. As discussed, the Complaint alleges that Plaintiff has suffered loss of goodwill with current and prospective customers and reputational damage, among other things, as a result of Defendant's unlawful attempts to solicit Plaintiff's customers and use its proprietary information. The Court finds this is sufficient to state a claim for tortious interference. Further, as discussed, the Complaint sufficiently alleges a basis for damages.

Finally, Defendant argues that Plaintiff's declaratory judgment claim must be dismissed because the Complaint should have cited to Minnesota's declaratory judgment statute, not the Utah statute. Additionally, Defendant argues that, because declaratory judgement is a remedy, not an independent cause of action, and all of Plaintiff's other claims fail, so too must their request for declaratory judgment.

While Defendant is correct that declaratory judgment is not an independent claim, the Court has not dismissed Plaintiff's other claims, so Defendant's second argument in support of dismissal fails. Next, as argued by Plaintiff, the Declaratory Judgment Act is procedural and does

---

[90] *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553 (internal quotation marks and citation omitted).

[91] *Proctor & Gamble Co. v. Haugen*, 947 F. Supp. 1551, 1556 (D. Utah 1996) (quoting *St. Benedict's Dev. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991)).

not create a substantive cause of action.[92] Accordingly, in a diversity case, while state law "will control the substantive issues of the case, the federal Declaratory Judgment Act will control the procedure governing Plaintiff's claim for declaratory judgment."[93] As this case was removed from state court by Defendant, the Court will construe the claim as being brought under the Federal Declaratory Judgment Act instead of Utah law, and will not order dismissal.

Based on the above analysis, the Court finds no basis to either dismiss Defendant from the case for lack of jurisdiction under Rule 12(b)(2), or to dismiss any of Plaintiff's claims for failure to state a claim under Rule 12(b)(6). Accordingly, the Court will deny the Motion.

## III. CONCLUSION

It is therefore

ORDERED that Defendant's Motion to Dismiss (Docket No. 6) is DENIED.

DATED this 28th day of September, 2026.

BY THE COURT:

Ted Stewart
United States District Judge

[92] *Farmers All. Mut. Ins. Co. v. Jones*, 570 F.2d 1384, 1386 (10th Cir. 1978) ("[The Declaratory Judgement] involves procedural remedies and not substantive rights . . . it merely provides another procedure whereby parties may obtain judicial relief.").

[93] *Miller v. Cincinnati Ins. Co.*, 323 F. Supp. 3d 1253, 1256 (D.N.M. 2018) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 72 (1938)).